IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: JOSEPH C. ABRAHAM AND CANDICE O. ABRAHAM, | § § § § § | CIVIL ACTION: H-12-2514 |
| Debtors | § | |

| | | |
|---|---|---|
| BARBARA MORA and MEREDITH NEILL, | § § | BANKRUPTCY CASE 09-37705 |
| Appellants, | § § | CHAPTER 7 CASE Adversary No. 10-03227 |
| VS. | § § | |
| JOSEPH C. ABRAHAM AND CANDICE O. ABRAHAM, | § § § | |
| Appellees. | § | |

**OPINION AND ORDER**

In the above referenced appeal Appellants Barbara Mora and Meredith Neill,[1] Plaintiffs/"Petitioning Creditors" below, seek a reversal of United States Bankruptcy Judge Jeff Bohm's decision[2] following a bench trial granting a discharge of certain debts to Appellees/Defendants below/Debtors Joseph C. Abraham and Candice O. Abraham in Adversary Proceeding No. 10-03227, a core proceeding under 28 U.S.C. § 157(b)(1), on the grounds that Appellees

---

[1] Lisa Quinn, a Plaintiff creditor in the Adversary Proceeding and a party to the Notice of Appeal filed in this action, did not join in the brief filed by Mora and Neill nor file one on her own. The Court therefore finds that she has abandoned the appeal. Thus the Court does not address Judge Bohm's findings of fact and conclusions of law relating to her.

[2] See instruments #6-20 (transcript of oral findings of fact and conclusions of law made on the record on July 12, 2012) and #6-21 (Judgment).

committed fraud and their debt should not have been discharged under 11 U.S.C. §§ 523(a)(2)(A) and (B), (a)(4), and (a)(6).

Appellees Joseph C. Abraham and Candice Onks Abraham have informed the Court that they cannot afford an attorney nor a trip to Houston, will not be submitting any briefing, and will rely on the Honorable Jeff Bohm's judgment. #9.

After careful review of the whole designated record, for the reasons stated below, the Court affirms the findings and conclusions of the Bankruptcy Court.

## Standard of Review

This Court has jurisdiction over appeals from "final judgments, orders and decrees" of a bankruptcy court under 28 U.S.C. § 158(a)(1). *In re Berman-Smith*, 727 F.3d 997, 1000 (5th Cir. 2013). In "reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court." *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). This Court reviews findings of fact for clear error and conclusions of law *de novo*. *In re Lothian Oil, Inc.*, 650 F.3d 539, 542 (5th Cir. 2011). "A finding of fact is clearly erroneous when the appellate court, viewing the evidence in its entirety, 'is left with a firm and definite conviction that a mistake has been committed.'" *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258-59 (5th Cir. 2006). Conclusions of law of the bankruptcy court are reviewed *de novo*. *In re Chestnut*, 422

F.3d 298, 301 (5th Cir. 2005).  Mixed questions of law and fact are reviewed *de novo*, *In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 557 (5th Cir. 2009), *citing In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 583 (5th Cir. 2008).  "If the district court's finding is plausible in light of the record viewed as a whole, the court of appeals cannot reverse even though, if sitting as the trier of fact, it would have weighed the evidence differently." *Id., citing Anderson*, 470 U.S. at 573-74.  "'[D]ue regard shall be given to the opportunity of the trial court to judge [] the credibility of witnesses.'" *Bertucci,* 465 F.3d at 258, *citing* Fed. R. Civ. P. 52(a) and *quoting Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573 (1985).  "The court owes even greater deference to findings based on the credibility of witnesses and must uphold them if based on coherent, internally consistent, and facially plausible testimony that is not contradicted by external evidence." *Id.* at 259, *citing id.* at 575.  "If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.  The appellant bears the burden of showing that a finding of fact by the bankruptcy court is clearly in error.  *In re Davis*, No. 07-33986-H3-7,2012 WL 2871662, at *3 (S.D. Tex. July 10, 2012)(*citing Perry v. Dearing*, 345 F.3d 303, 309 (5th Cir. 2003)), *aff'd*, 538 Fed. Appx. 440 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1002 (2014).

## Relevant Law

A bankruptcy court has exclusive jurisdiction to decide whether a debt is nondischargeable as defined by the bankruptcy law. *Matter of Dennis*, 25 F.3d 274, 278 (5th Cir. 1994). As creditors claiming nondischargeability, Appellants bear the burden of proving by a preponderance of the evidence that the debt is exempt from discharge. *In re Gauthier*, 349 Fed. Appx. 943, 945 (5th Cir. 2009), *citing Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011), *citing Hudson v. Raggio & Raggio (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

### 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A), exempting from discharge a debt obtained by false pretenses, a false representation or actual fraud, provides that

> a discharge under § 727 of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders's financial condition.

Although other Courts of Appeal apply the same standard to all §

523(a)(2)(A) claims, the Fifth Circuit differentiates the elements of "actual fraud" and of "false pretenses and false representations," based on whether the representation was made about a past or a future matter. *RecoverEdge LP v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995). A false representation or false pretense under § 523(a)(2) the creditor must show by a preponderance of the evidence (1) a knowing and fraudulent falsehood, (2) describing past or current facts, that (3) was relied upon by the other party. *Id.* at 1292-93, *citing Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992). *See also Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 602 (5th Cir. 1991)("'A mere promise to be executed in the future is not sufficient to make a debt nondischargeable, even though there is no excuse for a subsequent breach.'"), *citing* 3 *Collier on Bankruptcy* 15th Ed. . . . § 523.08[4]. A false representation involves an express statement while a "false representation may be based on misleading conduct without an express statement." *Walker v. Davis (In re Davis)*, 377 B.R. 827, 834 (E.D. Tex. 2007).

To prevail on a claim that a debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A) because of actual fraud, a creditor must show by a preponderance of the evidence that (1) the debtor made a misrepresentation, (2) the debtor knew the misrepresentation was false, (3) the representation was made with the intent to deceive

the creditor, (4) the creditor actually and justifiably relied[3] on the representation, and (5) the creditor suffered a loss as a proximate result of its reliance.  *In re Acosta*, 406 F.3d at 372. Moreover actual fraud can focus on a promise of a future performance made with the intent not to perform.  *Trenholm v. Ratcliff*, 646 S.W. 2d 927, 930 (Tex. 1983). "Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving 'moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'"  *I In re Acosta*, 406 F.3d at 372*, citing In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992).  The court may infer an intent to deceive from "'reckless disregard for the truth or falsity of a statement, combined with the sheer magnitude of the resultant misrepresentation.'"  *Id.*, *quoting In re Norris*, 70 F.3d 27, 30 n.12 (5th Cir. 1995), *citing In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994).  Where the speaker has an unreasonable but honest belief that a representation is true and has information justifying that it is, he does not have an intent to deceive, i.e., "a 'dumb' but honest" defendant does not have scienter.  *Id., citing Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997).  Exceptions to discharge under § 523 should be construed in favor of the debtor. *Fezler v. Davis (In re Davis)*, 194 F.2d 570, 573 (5th Cir. 1999).

---

[3] The Fifth Circuit does not require the creditor to have "reasonably" relied on the representation.  *RecoverEdge,* 44 F.3d at 1293 n.17.

"It is well settled that silence can create a false impression, providing the basis for a misrepresentation that is actionable under § 523(a)(2)(A)." *In re Demarest*, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995), *aff'd*, 124 F.3d 211 (9th Cir. 1997), *cert. denied*, 525 U.S. 827 (1998). *See also In re Lau*, No. 11-40284, Adv. 11-4203, 2013 WL 5935616, at *18 (Bnkrtcy. E.D. Tex. Nov. 4, 2013)("The failure to disclose a material fact when one has a duty to do so is sufficient grounds for nondischargeability for fraud under § 523(a)(2)(A) of the Bankruptcy Code."). Whether there is a duty to disclose is a question of law for the court. *Id., citing In re Int'l Profit Assocs., Inc.*, 274 S.W. 3d 672, 678 (Tex. 2009). The Fifth Circuit recognizes such a duty in fiduciary or confidential relationships and outside of a fiduciary or confidential relationship when a party voluntarily discloses some, but not all, material factors or where the speaker fails to disclose new information that makes an earlier representation misleading or untrue. *In re Lau*, 2013 WL 5935616, at *19.

In Texas to show fraud by nondisclosure the creditor must prove "(1) a party conceals or fails to disclose a material fact within that party's knowledge, (2) the party had a duty to disclose the fact, (3) the party knows that the  other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (4) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, (5) the other party

justifiably relies on the nondisclosure, and (6) the other party suffers injury as a result of acting without knowledge of the undisclosed fact." *In re Edelman*, No. 13-31182-BJH, Adv. 13-03126-BJH, 2014 WL 1796217, at *34 (Bankrtcy. N.D. Tex. May 6, 2014), *citing Bradford v. Vento*, 48 S.W. 3d 749, 755-56 (Tex. 2001). Plaintiffs must prove these elements by a preponderance of the evidence. *Id*. A fact is material if "'disclosure of the fact would likely affect the conduct of a reasonable person concerning the transaction in question.'" *In re Lau*, 2013 WL 5935616, at *18. Justifiable reliance requires evidence that the plaintiff actually relied on the false representations and that its reliance was justified under the circumstances. *Id*. at *20, *citing First Horizon Home Loan Corp. v. Apostle (In re Apostle)*, 467 B.R. 433, 443 (Bankr. W.D. Mich. 3012). Justifiable reliance is a lower standard than reasonable reliance: it does not require the plaintiff to prove reasonableness, nor does it impose a duty to investigate unless the falsity is easily apparent or there are red flags indicating that reliance is not warranted. *In re Lau*, 2013 WL 5935616, at *20, *citing First Am. Title Ins. Co. v. Lett (In re Lett)*, 238 B.R. 167, 186 (Bankr. W.D. Mo. 1999); *Guion v. Sims (In re Sims)*, 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012); and *Baker v. Sharpe (In re Sharpe)*, 351 B.R. 409, 423 (Bankr. N.D. Tex. 2005)(A plaintiff "may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he or she

used her senses to make a cursory examination or investigation. '[O]nly where, under the circumstances, the facts should be apparent to a person of the plaintiff's knowledge or intelligence from a cursory glance, or where the plaintiff has discovered something that should serve as a warning that he is being deceived, is [the plaintiff] required to make an investigation of his own.'"), *citing Field v. Mans*, 516 U.S. 59, 71-72 (1995). Justifiable reliance is not an objective standard: to determine if reliance is justified the court looks at the circumstances of an individual case and the traits of a particular plaintiff. *Id.*, *citing Manheim Automotive Financial Services, Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005), and *Field v. Mans*, 516 U.S. 59, 70-71 (1995)(Justifiable reliance incorporates "the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases."). Texas Civil Practices and Remedies Code § 41.003(a) allows the Court to award exemplary damages when clear and convincing evidence demonstrates that the injury for which the claimant seeks to recover exemplary damages results from malice, fraud or gross negligence. *Id.* at *37.[4]

---

[4] Under § 523(a)(2)(B), debts obtained by "a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied are excepted from discharge." *In re Bandi*, 683 F.3d 631, 674 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 845 (2013). This § 523(a)(2)(B) exception

**Title 11 U.S.C. 523(a)(4)**

Title 11 U.S.C. 523(a)(4) provides that "[a] discharge under section 727 . . . does not discharge an individual from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Its purpose is to deal with circumstances where "debts [are] incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that was not the debtor's." *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 502 (5th Cir. 1998), *citing In re Boyle*, 819 F.2d 583, 588 (5th Cir. 1987). For purposes of this statute, "fiduciary" "is narrowly defined" and "applies only to technical or express trusts, and not to constructive trusts." *In re Edelman*, 2014 WL 1796217, at *40 (Bkrtcy. N.D. Tex. May 6, 2012), *citing LSP Inv. P'Ship v. Bennett (In re Bennett)*, 989 5th Cir. 779 (5th Cir. 1993). Moreover "the trust giving rise to the fiduciary

---

is narrowly interpreted and applies only to statements about the debtor's or an insider's financial condition. *Id.* at 676. "Financial condition" means the "new worth," the general "overall financial condition" of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities. *In re Bandi*, 683 F.3d at 677. Judge Bohm directed a verdict for Defendant Debtors on Plaintiffs' § 523(a)(2)(B) claim against them on the grounds that Plaintiffs did not and could not reasonably rely on any financial statements that Debtors had given to them because Plaintiffs' testimony established that they did not understand the numbers on those financial statements. #6-21 at p.4. Mora and Neill have not appealed that decision.

relationship must exist prior to the act creating the debt, i.e.,
the debtor must have been a trustee prior to his or her wrongdoing."
*Id., citing id.* A technical or express trust includes more than
trusts arising by formal trust agreement and encompasses
"relationships in which trust-type obligations are imposed pursuant
to state or common law." *In re Bennett* at 784-85.  Therefore state
law first determines what obligations are imposed on the debtor with
regard to the relationship and whether a trust obligation exists.
*In re Edelman*, 2014 WL 1796217, at *40.  Then the court must decide,
as a matter of federal law, whether these obligations under state
law satisfy the federal law requirements of "fiduciary capacity"
under § 523(a)(4).  *Id.*  The United States Supreme Court in *Bullock
v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013) held that
"defalcation" in § 523(a)(4) "includes a culpable state of mind
requirement" involving the ""knowledge of, or gross recklessness in
respect to, the improper nature of the relevant fiduciary behavior":

> [W]here the conduct at issue does not involve bad faith,
> moral turpitude, or other immoral conduct, the term
> requires an intentional wrong.  We include as intentional
> not only conduct that the fiduciary knows is improper but
> also reckless conduct of the kind that the criminal law
> often treats as the equivalent.  Thus, we include
> reckless conduct of the kind set forth in the Model Penal
> Code.  Where actual knowledge of wrongdoing is lacking,
> we consider conduct as equivalent if the fiduciary
> "consciously disregards" (or is willfully blind to) "a
> substantial and unjustifiable risk" that his conduct will
> turn out to violate fiduciary duty.

*Id.* at 1759, *citing* ALI, Model Penal Code § 2.02(2)(c), p. 226
(1985) and § 202, Comment I at 248 (explaining that the Model Penal

Code's definition of "knowledge" was designed to include 'willful blindness'").   Section 202(c), *id.* at p. 226, provides that the risk "'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'"   *Id.* at 1760.

## 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Federal Bankruptcy Code bars discharge of debt incurred for "willful and malicious injury by the debtor to another entity or to the property of another entity."   An injury is "willful and  malicious" for purposes of § 523(a)(6) "where either (1) there is an objective substantial certainty of harm or (2) there exists a subjective motive to cause harm."   *In re Edelman*, 2014 WL 1796217, at *42.   The Fifth Circuit in *In re Miller*, 156 F.3d at 606, held that under § 523(a)(6) "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."

Where the primary debt is nondischargeable under § 523(a)(2)(A), (a)(4) and/or (a)(6), related ancillary awards including attorney's fees and interest are also nondischargeable. *In re Edelman*, 2014 WL 1796217, at *43.

## Liability of Owner or Shareholder of a Corporation for Breach of Contract Claims

"The corporate form normally insulates shareholders, officers and directors from liability for corporate obligations . . . ." *Castleberry v. Branscum*, 721 S.W. 2d 270, 271 (Tex. 1986). Previously under Texas law, the corporate veil could only be pierced under three theories:  (1) the corporation was the alter ego of its owners and/or shareholders; (2) the corporation was used for illegal purposes; and (3) the corporation was used as a sham to perpetrate fraud.  *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 143 (5th Cir. 2004), *citing W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994).  The alter ego doctrine is relevant "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Castleberry*, 721 S.W. 2d at 272.  "It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal properties." *Castleberry*, 721 S.W. 2d at 272. Nevertheless, placing strict restrictions on a contract claimant's ability to pierce the corporate veil, § 21.223 of the Texas Business Organizations Code states,

> (a) A holder of shares [or] owner of any beneficial
> interest in shares . . . may not be liable to the

corporation or its obligees with respect to . . .

>    (2) any contractual obligation of the
>    corporation or any matter relating to or
>    arising from the obligation on the basis that
>    the holder [or] beneficial owner is or was the
>    alter ego of the corporation or on the basis of
>    actual or constructive fraud, a sham to
>    perpetrate a fraud or other similar theory . .
>    . .
>
>    (b)   Subsection (a)(2) does not prevent or limit the
>    liability of a holder [or] beneficial owner . . . if the
>    obligee demonstrates that the . . . beneficial owner . .
>    . caused the corporation to be used for the purpose of
>    perpetrating and did perpetrate an actual fraud on the
>    obligee primarily for the direct personal benefit of the
>    holder [or] beneficial owner . . . .

Any such liability for an obligation on behalf of the corporation
"is exclusive and preempts any other liability imposed for that
obligation under common law or otherwise." *Id.* § 21.224; *Lone Star
Air Systems, Ltd. v. Powers*, 401 S.W. 3d 855, 862-63 (Tex. App.--
Houston [14[th] Dist. 2013).  Section 21.223 requires actual fraud to
pierce the corporate veil on the basis of alter ego.  *Rimade*, 388
F.3d at 143.   Actual fraud" "involves dishonesty of purpose or
intent to deceive." Tex. Bus. Corp. Act Ann., art. 221(A)(2)("[T]he
. . . owner . . . caused the corporation to be used for the purpose
of perpetrating and did perpetrate an actual fraud on the obligee
primarily for the direct personal benefit of the . . . owner . . .
.".   Thus § 21.223 overruled *Castleberry* to the degree that a
failure to observe corporate formalities is no longer a factor in
proving alter ego in contract claims and it eliminated constructive

fraud as a means to pierce the corporate veil.[5] *Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 & n.4 (5th Cir. 1994).  "In other words, alter ego or other similar theories may be used to pierce the corporate veil *only if* (1) actual fraud is shown, and (2) it was perpetrated primarily for the direct personal benefit of the holder." *Ocram, Inc v. Bartosh*, 2012 WL 4740859, *3 (Tex. App.--Houston [1[st] Dist.] Oct. 4, 2012).

**Bankruptcy Court's Findings of Fact and Conclusions of Law**

This Court summarizes Judge Bohm's key Findings of Fact and Conclusions of Law made on the record on July 12, 2012 from the transcript (#6-21) and written judgment (#6-20).  Judge Bohm made clear that to the extent that his findings of fact are conclusions of law and vice versa, they should be construed a such.  The Court asserts the same.

Appellant Barbara Mora ("Mora") is a 73-year-old woman with a high school degree and one year of college and worked for an insurance company where she wrote and filed insurance applications with various regulating agencies.  Co-Appellant Meredith Neill

---

[5] *See also Hidden Values, Inc. v. Wade*, Civ. A. No. 3:11-CV-1917-L, 2012 WL 1836087, at *4 n.4 (N.D. Tex. May 18, 2012)("Section 21.233 is the amended , codified version of article 2.21 of the Texas Business Corporation Act and was adopted by the Texas legislature to limit a shareholder's personal liability for the contractually related obligations of a corporation and requires a showing that 'actual fraud,' rather than some lower threshold of wrongful conduct, has been perpetrated through use of the corporate form for the direct personal benefit of the corporations's shareholder that is sought to be charged with liability.").

("Neill") is approximately 60 years old, holds a bachelor's and a master's degree, and is an ordained minister and a marriage and family law psychotherapist.

Appellees Joseph and Candice Abraham are husband and wife. Candice Abraham is the 100 percent owner and president of ABA, Inc. d/b/a Heartland Homes, while her husband is vice-president, treasurer and secretary of Heartland Homes.  The Abrahams are the only officers and directors of Heartland Homes, which was incorporated by them in 1994 and which built and sold houses in Harris County, Austin County, Fort Bend County, and Waller County, Texas.  Candice Abraham also is the 100 percent owner and president of C&J Land and Cattle ("C&J"), and her husband is vice-president, treasurer and secretary of that entity.  Again they are the only officers and directors in this entity.  The Abrahams also owned entities known as TSCD, Inc. and PWP, Inc.

Mora first met the Abrahams before 1996 and introduced Neill to them in 1994 or 1995.  The parties became friendly.  From 1996-2006 a business relationship developed among them in Mora and Neill's funding construction loans for the Abrahams.  Joseph Abraham would at times tell Mora and Neill about a particular project relating to Heartland Homes that he was embarking on and the women would ask him to transfer money[6] from their loan on a previous

---

[6] See Mora trial testimony, #6-15 at p. 15:13-p.16:20; p. 20:1-p. 21:24 (stating that Joseph Abraham would not give money back to her when each house was sold, but that the money was just

-16-

completed project to the next one, and at times they would be given

a deed of trust on the particular property.[7]   While Mora and Neill

claim they were "investing" in the properties, the Abrahams

characterize the monies as "loans."   Judge Bohm agreed with the

Abrahams.   Most of the communications were between Mora and the

_____

transferred to the next pursuant to discussions between him and
Mora, with Abraham keeping the money between transactions).

   [7] The Court notes that Heartland Homes' practice of providing
deeds of trust to Mora and Neill for their financial support varied
at least in part depending on the nature of the property and the
percentage of the financing that their loan represented.   The trial
transcript reflects that in their earlier transactions, e.g.,
Spoonbill and two houses at Golden Eye, Mora and Neil did receive
deeds of trust from Heartland Homes. #6-5 at p. 14:20-25; p.21:12-
23.   Moreover Joseph Abraham testified that thus he gave Mora and
Neill security interests in Spoonbill, explaining, #6-8 at p.
144:16-21,

     That was the first property we did, it represented a
     model home, it was a straight construction loan, no
     development. Nothing to do, nothing fancy or anything
     like that.   It was just like any other construction
     lender we do business with, except this was--these loans
     were done with two private individuals.

After Spoonbill Mora and Neill next provided funding for Katy
Homestead to ABA/Heartland Homes: "In the fall of 1997 we had
normal financial institution lending fall apart on a property we
called Katy Homestead, which was 236 raw acres at the corner of
Franz Road and Katy-Fort Bend. We did not do a deed of trust, they
knew there was no deed of trust."   #6-8 at p. 145:22-p. 146:3.
After Katy Homestead, Plaintiffs loaned Heartland Homes funds in
1998 for spec houses to be built on Goldeneye and sold, a
construction loan for which a deed of trust was provided.   *Id*. at
p. 144:23-p. 1466.   Abraham explained it depended on the amount of
the loan:   if the loan was small compared with that of first
mortgage lenders, those first mortgage lenders would object to a
secondary lien on the property and Heartland Homes' ability to get
large tract financing would have been restricted.   *Id*. at pp. 146-
47.

Abrahams, as Neill's involvement in direct communication was limited; Neill testified that she relied almost completely on Mora to decide whether to provide loans to Heartland Homes.

Judge Bohm found that the Abrahams were not agents of Mora and Neill.[8] At no time did Plaintiffs make any capital contributions to or purchase any stock in Heartland Homes. Mora and Neill did not share in profits and losses of Heartland Homes. Furthermore the Abrahams were not financial advisors to, real estate brokers for, or business brokers for Mora and Neill. Mora and Neill simply lent money to Heartland Homes and other corporations. Because there was no partnership agreement, Judge Bohm found that Mora and Neill were not in partnership with Heartland Home or the Abrahams, but only involved in a business "borrower/lender arrangement." Judge Bohm also concluded that there was no fiduciary relationship and the Abrahams did not owe fiduciary duties to Mora and Neill.

In December 1999, Joseph Abraham told Mora that Debtors were considering buying thirty-three acres of real estate in Sealy, Texas to develop a retirement homes, a project dubbed "Sealy Homestead." He took Mora to the area to see it, and in turn Mora then discussed it with Neill. The Sealy property was purchased and the title put in the name of C&J. From 2000-2006 the Abrahams, through C&J (whose

---

[8] "An agent is a person who (1) is authorized to act for another and (2) is subject to the control of the other." *Gonzales v. Am. Title Co. of Houston*, 104 S.W. 3d 588, 593 (Tex. App.- Houston [1st Dist.] 2003).

funds came out of Heartland Homes), also gradually purchased sections of another tract of land that they named "Sealy Station," with the title again in the name of C&J.[9] On February 13, 2004 Mora and Neil turned over monies amounting to $357,018, nearly their life savings, and received a promissory note signed by Heartland Homes in that amount, payable by December 31, 2006.  The note evidenced the loan Mora and Neill provided to the corporation.  The Abrahams personally guaranteed the note, further evidencing a borrower/lender relationship between Mora and Neill on the one hand and Heartland Homes on the other hand, with Heartland Homes being operated by the Abrahams.

Supported by documentary evidence, Joseph Abraham testified that he and Mora discussed security and decided the loan would be secured by the personal guarantee from the Abrahams.  Judge Bohm found that no deed of trust was executed to secure the promissory note.

In December 2005 the Abrahams sold Sealy Homestead for $600,000 and after paying off the mortgages on it, there was approximately $300,000 remaining that was placed in the operating account of Heartland Homes.  The Abrahams took the $300,000 and used it to pay

---

[9] Joseph Abraham stated a number of times during the trial that C&J was formed to protect the properties it purchased from potential liabilities of homebuilding activities since home builders are frequently sued.  Because C& J had no bank account, any money paid to it when it sold the properties went back to Heartland.

for part of Sealy Station; none of the money went to Plaintiffs, and the Abrahams did not tell Mora and Neill until the next year, in October 2007, about the sale of Sealy Homestead.  C&J had a contract to sell Sealy Station that was also not disclosed to Mora and Neill. Mora and Neill did not receive a deed of trust on either Sealy Homestead or Sealy Station.

From 2006-2008 the Abrahams stopped sending Mora and Neill any financial documents.  On December 26 and December 28, 2008 the Abrahams met with Mora, and Joseph Abraham gave her financial statements indicating that Heartland Homes owed Mora and Neill approximately $578,495.  The Abrahams also told Mora and Neill then that they and Heartland Homes had no money and were not able to repay the promissory note.

The Abrahams drew down monies that were in Heartland Homes and used the funds to pay credit card debt and food as well as their personal bills.

In January 2009 Mora, Neill and Lisa Quinn filed suit in state court against the Abrahams, Heartland Homes, and C&J.  On May 4, 2009 they also filed an involuntary petition against Heartland and C&J.  On October 9, 2009 they filed an involuntary Chapter 7 petition against the Abrahams.  On May 10, 2010 they filed their original complaint in this action, seeking non-dischargeability under §§ 523(a)(2) and (a)(4).  They amended their complaint on September 15, 2010 to assert that the Mora and Neill's claims are

also nondischargeable under § 523(a)(6).

Regarding Mora and Neill's claim of fraud under § 523(a)(2)(A), contending that they have a deed of trust on the property that the Abrahams sold, that they would not have lent the money without it, and that they should have gotten their money from the $300,000 left over after the sale of the Sealy Homestead, Judge Bohm found there was no evidence of a deed of trust. Furthermore there is evidence (Ex. 1 at trial) from Mora that the parties talked about the security for the loan, but instead decided that rather than a deed of trust, there would only be the promissory note signed by Heartland Homes, with an individual personal guarantee from the Abrahams. Observing that there was contradictory testimony from the parties, with Joseph Abraham stating that he never said that Mora and Neill would get a deed of trust and Mora and Neill testifying the opposite, Judge Bohm expressly stated he could not find that either Joseph or Candice Abraham represented that a deed of trust would be conveyed either at that time or at a later time. While he found that it was clear that Mora and Neil loaned money to Heartland Homes, that the loan was personally guaranteed by the Abrahams, and that the loan was not paid back, it was also obvious that the real estate market "started tanking in 2008 and 2009" and that the Abrahams' business went downhill with it. He found the Abrahams were not open about informing Plaintiffs about what was happening in the real estate business in Sealy, Texas, but that fact was not

-21-

sufficient to support a claim under § 523(a)(2)(A).  Under the law, for a fraud claim Mora and Neill have the burden to prove by a preponderance of the evidence that a representation was made, that it was false, that at the time the speaker made the misrepresentation he knew it was false, that he made it with the intent that the other party would rely upon it, that the other party did rely upon it, and as a result suffered damage.  He found that Mora and Neill indisputably suffered damage, but that they failed to meet their burden to show the Abrahams promised them a deed of trust for the loan made, which instead was evidenced by the promissory note (Ex. 2).  Judge Bohm further found credible testimony from Joseph Abraham that at the time the loan was made, he intended to repay it.[10]  Mora and Neill had made loans to the Abrahams previously and conceded that those had been repaid.  Judge Bohm also found credible the Abrahams' testimony that they, too, were making loans in an effort to save their business.

Judge Bohm found that the fact that the Abrahams paid themselves salary and paid their bills and their loans back from funds in Heartland Homes did not constitute fraud and cited his earlier opinion *Husky Int'l Electronics, Inc. v. Ritz (In re Ritz)*, 459 B.R. 623, 632 (Bnkrtcy. S.D. Tex. 2011), demonstrating that it is extremely difficult for creditors of a corporation like Heartland

---

[10]  Joseph Abraham testified that when the loan was made he intended to repay it, "just like we'd repaid the previous five." #6-8 at p. 153:3-5.

Homes to prevent the discharge of corporate owners and directors such as the Abrahams on the grounds that they took money out of the corporation to repay loans and pay bills.  Candice Abrahams testified that she used her credit cards to put money into the company to make payroll and that when the company went even further downhill, she took the money out to repay the credit card debts. Judge Bohm stated that to him "[T]hat was not fraud.  It was trying to keep the company alive.  And there's no question--I can understand why the Plaintiffs are unhappy, they felt they weren't kept apprised of the business, but once again, that does not amount to fraud."  #6-21 at p. 21.

Judge Bohm believed testimony from Mora that she and Neill trusted the Abrahams, but he observed that such trust does not automatically transfer into prevailing on an § 523(a)(2)(A) action for fraud.  Because the public policy behind a Chapter 7 bankruptcy is to give the debtor a "fresh start,"[11] Mora and Neill bear the burden to establish all the elements of any exception to dischargeability.

---

[11] "The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including 'the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts.'"  *In re Ritz*, 459 B.R. at 631 (quoting *Central Virginia Community College v. Katz*, 546 U.S. 356, 363–64 (2006), *citing Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)); *In re Shelton*, No. 13-70583, ADV 13-07022, 2014 WL 1576864, at *2 (Bkrtcy. S.D. Tex. Apr. 18, 2014)(same).

Judge Bohm summarized that the testimony of Mora, Neill, and Candice Abraham "convinces me that what's happened here is that [Mora and Neill] took their money and they gave it to folks that they'd developed a friendship with and trusted, but that they themselves didn't understand the real estate business, didn't stay--didn't look at the financial statements and pretty much put their faith that the Abrahams would be able, through their company, Heartland Homes, to develop, you know, these tracts of land, build houses, sell houses, generate profits and turn around and repay the note." #6-21 at p.21.  In essence, that Appellants lent the money and received a promissory note signed by the company, but no deed of trust, and Exhibit 1 (facsimile from Mora) which shows they understood they were not getting a deed of trust, what they have is an unsecured loan.  Theirs was a business decision; it was not fraud.  When the land was sold by the corporation, there was no lien by Mora and Neill on the excess proceeds, so they were not entitled to them, as they would  have been had they had a deed of trust lien. Even if Mora and Neill's claim that they were promised a deed of trust is true, although challenged by Joseph Abraham, it is of no avail.  "It has long been settled law in Texas that a lien will not be created upon a real estate by parol agreement." *Home Investment Co. v. Fidelity Petroleum Co.*, 249 S.W. 1109, 1111 (Tex. Civ. App.--Dallas 1934). Heartland Homes or C&J was entitled to use those monies in its business, and did so in the purchase of Sealy Station,

-24-

and there is nothing out of the ordinary in a real estate development to buy another tract of land. Once the money was lent to Heartland Homes, it was no longer Mora and Neill's, despite their claim that the Abrahams "moved our money without our knowledge." #6-21 at p. 24. That the business ventures of Sealy Homestead and Sealy Station failed, and the business subsequently failed, does not constitute fraud.

Judge Bohm indicated that Mora's testimony did not carry much weight because while she complained about Joseph Abraham and said she did not trust him, on the other hand she asked him to build her a house after she learned that Sealy Homestead was sold and the money used to purchase Sealy Station. #6-21 at p. 25. See also Judgment, #6-20 at p.2 (Reciting same reason and concluding, "In sum, this Court gives very little weight to Ms. Mora's testimony on key disputed issues in this dispute, and it gives substantial weight to the testimony of the Debtors.").

Judge Bohm denied all relief requested by Mora and Neill. He found that while the Abrahams owed the obligations under their personal guarantee, those obligations were dischargeable. To the extent that there was any money recovered by the Chapter 7 Trustee from the estate, Mora and Neill will share in it, but as to the Abrahams personally, their obligations are dischargeable.

As to Appellants' other claims, Judge Bohm concluded in denying Mora and Neill's motion for directed verdict that Mora and Neill's

§ 523(a)(4) action failed because they did not prove that a fiduciary relationship existed between them and the Abrahams.  In addition he held that the § 523(a)(4) claim for embezzlement could not proceed because the Abrahams did not "embezzle" when they placed money left over from the sale of Sealy Homestead into the corporate account of an entity owned and controlled by them (C&J), and Mora and Neill then lost whatever interest they had.  Larceny requires someone taking something which he had no right to take.[12]   Judge Bohm concluded that the loan money was given to the Abrahams for Sealy Homestead by Mora and Neill, not stolen.  Finally, he concluded that Mora and Neill's § 523(a)(6) claim for willful and malicious injury by the Debtors to another entity or to the property of another entity failed because the issue here was breach of contract, not damage to a property.  This Court concurs that these three claims (under §§ 523(a)(4), 523(a)(4), and 523(a)(6)) fail because they do not apply, given the facts here.

---

[12] The Court notes that *Black's Law Dictionary* (6th ed. 1990), defines "larceny" as follows:  "Felonious stealing, taking and carrying, leading, riding or driving away another's personal property, with intent to convert or deprive owner thereof. . . . The essential elements of a 'larceny' are an actual or constructive taking away of the goods or property of another without the consent and against he will of the owner or possessor and with felonious intent to convert the property to the use of someone other than the owner."  This Court further notes that the narrow definition of fiduciary applied under § 523(a)(4)(limiting it to express or technical trusts, with the trustee's duties arising independent of any contractual agreement that had been imposed before any claimed wrong) clearly and obviously does not apply here, where there are no trusts involved and where any claims Mora and Neill might have against the Abrahams arose from the loan agreement.

-26-

**Appellants' Brief (instrument #9)**

**Points of Error**

Appellants assert five points of error in this appeal:

1. Appellees/Defendants Joseph C. Abraham and Candice O. Abraham committed fraud in failing to disclose the diversion of funds and equity from Sealy Homestead to Sealy Station.

2. Appellees/ Defendants committed fraud in failing to disclose the sale of Sealy Homestead and accounting for and distributing the proceeds of the sale to Plaintiffs thereafter.

3. Appellees/Defendants committed fraud in failing to disclose the negative cash flow in 2006.

4. Appellees/Defendants committed fraud in failing to disclose that they had capped the value of their investment as of December 2006, making a determination that Appellants' investment would never increase in value after that time.

5. Appellees/Defendants committed fraud in stating in the December 2008 meetings that Appellants and their corporations had no money and that there was nothing left for Appellants and in failing to disclose cash and equity from recent transactions including (a) cash and benefits received from the sale and leaseback of the Business

Office to the mother of Candice Abraham; (b) the $200,000+ equity in the contract to sell 96 acres of land; and (c) the $400,000+ equity in the sale/option agreement between Terry Koy, Trustee, and C&J Land & Cattle, Inc.

Appellants assert that the money Appellants provided to the Abrahams was more than they needed to purchase Sealy Homestead. That fact is important because the parties agreed that no deed of trust would be used because the land and its planned improvements would adequately increase in value and thereby protect Appellants' investment.

C&J held title to the Sealy Station tract and was originally disclosed as the owner of the Sealy Homestead tracts. ABA, Inc. d/b/a Heartland Homes provided the cash for land acquisition and the debt incurred to purchase the land was in the name of C&J. Joseph Abraham managed the financial transactions for both corporations and treated the two as one corporation. C&J had no bank accounts and no employees.

For the purchase of Sealy Station, Appellees, without Appellants' consent or approval, borrowed funds on the equity of Sealy Homestead to acquire the new property. In 2005, after selling Sealy Homestead, they used equity from the sale to acquire Sealy Station, again without disclosing the transaction. Appellants did not inform Appellees when in 2006 Appellants' operating company for

the investments ran an operating deficit of more than $200,000.  By the end of 2006, Appellees concluded that Appellants' investment/loan would not increase in value and that Appellees were not likely to be able to repay the money, so they internally capped the value of that investment/loan without telling Appellees.  They also used this capped value in financial statements provided to other potential third-party lenders.

In December 2008 Appellants met twice with Appellees  and told Appellees that there was  no money  and provided them with Joseph Abraham's History of Investments (#9, Ex. 1).  But beforehand, in November 2008, Appellees made the following transactions without telling Appellants that they resulted in receipt of funds or equity interests:  (1) they initiated a sale with an option to repurchase a 92 acre tract, the Koy Option (Ex. No. 13); (2) they obtained a contract to sell the back bottom 96 acre tract with a net equity in excess of $200,000 (Ex. No. 3); (3) they sold the construction office with a lease back to Candice Abraham's mother and obtained a net payment of $176,000 (Ex. #7).  Appellants discovered these transactions afterward and filed suit in state court to seek damages in fraud and to stop any illegal distribution of funds, while the lenders who provided funds for the purchase of Sealy Sation began foreclosure proceedings.  Appellants filed involuntary petitions for bankruptcy to halt these foreclosure sales and reorganize the companies.  Subsequently they filed this adversary proceeding.

To meet the standard to reverse Judge Bohm's decision, Mora and Neill state that they are relying on admissions against interest in the testimony and admissions of Joseph Abraham and exhibits prepared by him or at his direction, copies attached to their brief.

Regarding Point of Error One, citing to attached selections of trial testimony which are categorized according to which day of trial it occurred,[13] Appellants emphasize that Joseph Abraham told Mora, when he first showed her around the Sealy Homestead tract, that Appellants' $275,000, which was more than needed to purchase that property, would be used to buy that property.   #9, trial transcript ("TR") Day 1 at pp. 38 and 40 and Day 2 at p. 60; Ex. 1 History of Investment at pp. A-5 through A-9, prepared by Joseph Abraham in December 2008 and showing that the funds were transferred to Sealy Homestead.   Nowhere else does this History of Investment show what happened to those funds later.   Nevertheless when Sealy Homestead was sold in 2005, Appellees borrowed $300,000 against it to buy Section 4 of Sealy Station and did not disclose that encumbrance to Mora.   TR, Day 1 at p. 65.   Another $300,00 in equity was received upon the sale of Sealy Homestead, but Appellees did not disclose the use of those funds or provide an accounting of the remaining $300,000 to Appellants, acts which Appellants characterize as a fraudulent diversion of funds.   TR, Day 1 at p. 59.   Appellants

---

[13] Because every page and line numbers are not available in Appellants' excerpts, the Court found it easier to locate the cited passages in the transcripts provided in #6.

contend that Appellees' failure to disclose the loan and the receipt of the sales proceeds constituted fraudulent concealment and that Appellees' silence resulted in an involuntary extension of credit without Appellants' consent or approval.

As Point of Error Two, Appellants charge that Appellees committed fraud in their failure to disclose the sale of Sealy Homestead and accounting for and distributing the proceeds of the sale to them afterwards.  Appellants assert that according to the terms of Exhibit 15, which the Abrahams produced in 2009 after the state court litigation, the Abrahams were obligated to disburse funds to Plaintiff upon the sale of Sealy Homestead.  Appellees admitted at trial that they did not disclose the sale of Sealy Homestead, make any accounting for the use of the funds, nor distribute any funds to Appellants after the sale.  TR, Day 11, pp. 58-59.  Instead, they used the equity in Sealy Homestead to acquire a portion of Sealy Station and used the final proceeds of the sale of Sealy Homestead in undisclosed operations of ABA, Inc. d/b/a Heartland Homes.

As their Third Point of Error, Appellants contend that Appellees again committed fraud in concealing their negative cash flow in 2006, when they had an operating loss of over $200,000.  TR, Day 1, at p. 54.  Appellants assert that in 2006, according to Joseph Abraham, property values in Sealy were stable and Appellants could have recouped their investment then.  TR, Day 10, pp. 22-23.

By the middle of 2009, property values were substantially reduced by the economy and by the closing of the largest employer in Sealy (BAE, TR, Day 1 at p. 103).

**Court's Decision**

The Court finds that Appellants' Points of Error essentially involve two issues: (1) whether the monies provided by Appellants to Appellees or their corporate entities were "investments," as argued by Appellants, or loans, as argued by Appellees and found by Judge Bohm; and (2) whether Appellees had a duty to disclose those matters that Appellants charge were fraudulently concealed. The answers to these two issues apply to and determine the validity of all five of Mora and Neill's Points of Error.

I. The Bankruptcy Court did not commit error in finding that Appellees did not commit fraud in failing to disclose diversion of funds and equity from Sealy Homestead to Sealy Station.

Judge Bohm correctly determined that Appellants's provision of funds for the purchase of Sealy Homestead was a loan, not an equity investment. That distinction is significant. *Black's Law Dictionary* (6th ed. 1990) at p. 936 defines "loan," a "temporary" lending," as "Delivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest." It defines "investment," *id.* at p. 825,

> An expenditure to acquire property or other assets in order to produce revenue; the asset so acquired. The placing of capital or laying out of money in a way intended to secure income or profit from its employment.

-32-

> . . . To purchase securities of a more or less permanent nature, or to place money or property in business ventures or real estate, or otherwise lay it out, so that it may produce revenue or gain (or both) in the future.

Loans must be repaid plus any associated interest; and they have an agreement and a repayment schedule, sometimes called a promissory note.  When a business takes a loan from a lender, the business still retains complete ownership and control of the business and can use the funds loaned in any manner it wishes; the lender does not receive any part of the profits or have any say in the business. If the business fails, the business still must pay the loan in full plus interest.

In contrast, an investment is a risk and can be lost.  An equity investment gives the investor some rights to control the business and the right to sue if these rights are violated.  If the business fails, the business does not have to pay back the investor unless there has been fraud involved. *See, e.g.,* http://smallbusiness.findlaw.com/business-finances/equity-vs-loans.html.  Judge Bohm found there was no fraud by the Abrahams, who only tried to save their business in the housing downturn.

Judge Bohm's finding and conclusion that Mora and Neill provided loans, not investment funds, to Heartland Homes for the purchase of Sealy Homestead and Sealy Station is in part based on his determinations about the credibility of the key witnesses.  As loans, Mora and Neill's financial support did not provide Mora and Neil with any control over Heartland Homes, and Heartland Homes

could do whatever it liked with the funds in its business.  As noted earlier, "'due regard shall be given to the opportunity of the trial court to judge [] the credibility of witnesses.'"  *Bertucci,* 465 F.3d at 258, *citing* Fed. R. Civ. P. 52(a) and *quoting Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573 (1985).  "The court owes even greater deference to findings based on the credibility of witnesses and must uphold them if based on coherent, internally consistent, and facially plausible testimony that is not contradicted by external evidence." *Id.* at 259, *citing id.* at 575.  Important here is that Judge Bohm found the testimony of Joseph Abraham very credible, while he gave little weight to that of Mora for reasons he explained.  Judge Bohm's finding that Mr. Abraham's testimony at trial that none of the Plaintiffs ever purchased stock in any of the Abrahams' corporations, but made six loans to Heartland Homes with "no property ownership, no stock ownership, no nothing, just loans for which they received loan documents" was credible and thus deserves deference.  #6-8 at p.142:14-143:7.  Mr. Abraham further testified that he never told Mora and Neill that he would give them a deed of trust or any other security agreement or security interest on Sealy Homestead or Sealy Station.  #6-8 at p. 143:8-144:4.  He also testified that he had talked to Mora about Heartland Homes' interest in developing Sealy Homestead and Sealy Station starting in 2000 and that she was aware that they were developing both properties.  #6-12 at pp. 10-11.  When asked if

-34-

"[a]t any time did any of the Plaintiffs request that their monies be used for any particular property," he answered no. #6-12 at p. 11:11-14.  He also testified that he never told them that he would segregate their funds from those borrowed elsewhere by ABA, Inc. or the Abrahams' other corporations.  #6-8 at p. 151:15-21.  To the question, "Did Ms. Mora ever specify that she wanted her investment used only for the purchase of land in Sealy Homestead"," Joseph Abraham responded, "No, sir."  #6-12 at p. 52:11-14.  He further declared that he never told them that he was acting as their agent, nor did they ever state that he was (#6-9 at p. 34:22-p. 35), nor did he ever tell Plaintiffs that he would place their interests as creditors above his own.

The record in this case also supports Judge Bohm's determination that the monies given to Heartland Homes by Mora and Neill were loans, not investments.  Exhibit 1, a facsimile from Mora, played a significant role at trial and Judge Bohm relied heavily on it in his decision.  Joseph Abraham testified that in it, Mora asked for a listing of the balance due under the promissory note, a "sort of gentle reminder that I hadn't provided her a note, but that she understands that it is a note secured only by Candice and me"; "we decided there would be no security, no first mortgage, no deed of trust on any of the properties . . . because it would inhibit our development of the property . . . and we decided in return we would raise the interest rate to 24 percent."  #6-8 at p.

126:14-21; #6-12 at p.7:9-p. 9:16.  Exhibit 3 is the notarized note signed by the Abrahams and sent to Mora, evidence of a loan.  #6-8 at p. 133:7-25.  Moreover, Joseph Abraham testified that he provided promissory notes for each and every loan that Mora and Neil made, that these notes never used the word "investment," and that they all used the word "loan."  #6-9 at p. 34:3-21.  During trial, Mora testified that the Abrahams sent them yearly 1099's "if we had any interest payments," and that Appellees received regular interest payments up through Sealy Homestead, after which they had an agreement with the Abrahams that they would not receive interest monthly or annually because "our money was used to purchase the land and we were to get paid back as the--the place was developed and the houses were built and sold."  #6-15, at pp. 41:2-p. 42:8.  Interest payments support Judge Bohm's finding that Mora and Neill's financial contributions were loans.  The failure of Mora and Neill to produce a deed of trust further supports a finding that the loan was unsecured other than by the Abrahams' personal guarantee.  Another example supporting the determination that Mora and Neill's funds were loans is Mora's testimony in response to the question "what was your understanding as to whether there were any other people that were helping him purchase the land at Sealy Homestead?": she responded that Abraham told her he did not want to do a deed of trust because banks or financial institutions would not lend him money for construction if the land was impaired by a second lien.

-36-

#6-16 at p. 12.   Specifically she stated, "Our understanding was that our money was what would be used to purchase the land and . . . what he said to me was if, when you build the house on it then it's worth more and you sell the house and then you get your interest and, of course, he would get the profit." *Id.* at ll. 21-25.

As for the Abrahams' nondisclosure of the movement of Mora and Neill's funds from Sealy Homestead to Sealy Station, the trial transcript indicates that after Plaintiffs initially provided funds for the real estate transaction known as Spoonbill, they told Joseph Abraham they wished to continue investing with him, so he moved their funds next to a Katy Homestead project, and then onto several homes in a project known as Goldeneye. #6-5 at p. 27-29.   Transfers of their money from one project to the next became their practice in their dealings.   In 1999-2000 Heartland Homes began building in Sealy, and Joseph Abraham took Mora out to see the Sealy Homestead property and told her "[t]hat we would be amenable to loaning-- having her loan us funds which may be used to purchase Sealy Homestead **and other developments** at that time. [emphasis added by this Court]" 6-5 at p. 33:16-19.   Moreover as pointed out, a small business receiving a loan can use the funds for its business as it chooses.   When asked at trial if it was his understanding that Mora's money would be used to purchase Sealy Homestead, Joseph Abraham replied, "No."   In response to the question, "What else

could it have been used for?," he answered, "It could have been used to purchase Sealy Station," #6-5 at p. 35:6-11. As noted, he also testified that Mora never told him that the money could only be used for Sealy Homestead. #6-12 at p. 52:11-21. Although as lenders Mora and Neill did not have the right to tell the Abrahams and/or Heartland Homes how to run the business and what should be done with their funds, nor is there evidence that they tried, Mora and Neill retain the right to seek to recoup some of their loan monies from what remains in the bankruptcy estate, as pointed out by Judge Bohm.

As for a duty to disclose, a "fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty." *Dernick Resources, Inc. v. Wilstein*, 312 S.W. 3d 864, 877 (Tex. App.-- Houston [1st Dist.] 2009). "It is well settled that 'not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.'" *Meyer v. Cathey*, 167 S.W. 3d 327, 330 (Tex. 2005). "Subjective trust, or a longstanding friendship or cordiality, standing alone, is not enough to create a relationship that imposes a fiduciary duty on another." *Vanderpool v. Vanderpool*, ___ S.W. 3d ___, 2014 WL 1622279, at *6 (Tex. App.--Tyler Apr. 23, 2014), *citing Lee v. Hasson*, 286 S.W. 3d 1, *14-15 (Tex. App.--Houston [14th Dist. 2007); *Farah v. Mafige & Kormanik, P.C.*, 927 S.W. 2d 663, 675 (Tex. App.--Houston [1st Dist.] 1996). "The fact one businessman trusts another and relies upon

another to perform a contract does not rise to a confidential relationship." *Farah*, 927 S.W. 2d at 675-76. Generally the relationship between a borrower and a lender is neither a fiduciary nor a special relationship. *Id.* at 675, *citing Manufacturers Hanover Trust Co. v. Kingston Inv. Corp.*, 819 S.W. 2d 607, 610 (Tex. App.--Houston [1st Dist.] 1991, no writ). A special relationship between a borrower and a lender has been found in instances such as where the lender exerts excessive control over or influence in the borrower's business activities. *Id.* This Court finds that Appellants have not shown special facts or conduct that would support a fiduciary relationship here. Moreover Joseph Abraham, whom Judge Bohn found credible, emphatically testified that he never entered into a fiduciary relationship with Mora and Neill and never promised them he would put their interests ahead of his; instead he insisted the relationship was based on a loan agreement contract. #6-8 at p.157:19-p.158:4; #6-9 at p.36:4-10.

Because Appellants have not demonstrated that a fiduciary relationship existed between them and Appellees, Appellants must show that Appellees had a duty to disclose arising from something other than a confidential relationship. Mora and Neil have not identified with the particularity required by Rule 9(b), no less provided evidence as is required at trial, of any affirmative statement made by the Abrahams subsequently found by them to be false or misleading, nor have they pointed to a partial disclosure

-39-

that conveys a false impression, thereby giving rise to a duty to speak.   Mora and Neill have not shown there was any false representation, false pretense, or actual fraud,[14] and thus Appellees had no duty to disclose the various matters of which Appellants complain.   There is also no evidence that any statement by the Abrahams induced Plaintiffs to enter into other loans to Heartland Homes; Mora and Neill chose to do so, whether because of their friendship with the Abrahams or earlier good returns on the initial loans or other reasons.

Finally this Court agrees with Judge Bohm that because Mora and Neill did not have a deed of trust, and therefore no lien on the Sealy Homestead, they were not entitled to the proceeds from its sale and cannot exert a claim to them.

II.  The Bankruptcy Court did not commit error in finding that Appellees did not commit fraud when they failed to disclose the sale of Sealy Homestead and provide an accounting for and information about the distribution of the proceeds of the sale afterwards.

Joseph Abraham testified that he probably did not tell Mora on or before December 2005 that he was selling Sealy Homestead, which was sold around December 2005.  #6-6 at p.61:16-19.  Mora and Neill have not shown by a preponderance of the evidence that Mr. Abraham had a duty to disclose the sale or provide an accounting or

---

[14] There is no evidence that Joseph Abraham knowingly and intentionally made a fraudulent falsehood to Mora and Neill about a present or past fact, or that Mora and Neill relied on such.

information about distribution of the proceeds of the sale.  As noted, they had no lien on Sealy Homestead and thus no right to the sale proceeds.  Because Mora and Neill's contributions were loans, and the relationship was not that of a fiduciary, the Abrahams had no duty to disclose such matters or need to ask for permission to use the funds for a particular property or project.

Moran and Neill have not proven that the Abrahams with "dishonesty of purpose or intent to deceive" caused their corporations to be used for the purpose of perpetrating, or that they did perpetrate, an actual fraud on Mora and Neill for the Abrahams' direct personal benefit.  Abraham agreed that he and his wife used Heartland monies for expenses for their personal home, but he explained that prospective buyers of houses came to their home to "see the quality of our construction" and that Candice Abraham used it as an office during the week, where customers came to discuss what they wanted so they would not have to leave a model home open. #6-8 at p. 147:4-p. 148:1. Judge Bohm also reasonably found the Abrahams put some of their own money into, as well as used some corporate funds, in an effort to save their company.  As officers and directors of their corporations that held the funds, the Abrahams are not personally liable to Mora and Neill for a breach of contract under § 21.223 of the Texas Business Organizations Code.

III.  The Bankruptcy Court did not err in finding that Appellees did

not commit fraud in failing to disclose the negative cash flow in 2006.

Although there was no duty to disclose the negative cash flow to the lenders in 2006, when asked, "Did you tell the Plaintiffs anything that would indicate difficulties?," Joseph Abraham responded, *id.* at p.55:24–p. 56:7,

> A.  Just about every discussion we had.  We talked about problems of getting developments done.  The problems of development financing, where the economy was headed, what the market was doing these days.
>
> Q.  Did you ever try to conceal anything about your business from any of the Plaintiffs?
>
> A.  No, sir.

As noted, Judge Bohm found Abraham's testimony credible, unlike Mora's.

IV.  The Bankruptcy Court did not err in finding that Appellees did not commit fraud in failing to disclose that they had capped the value of their investments as of December 2006 based on a determination that Appellants' investment would never increase in value after that time.

Abraham conceded that after 2006 he calculated for internal purposes that Mora and Neill's interest capped out at $579,475, but he did not provide them with that information until sending them a financial statement around December 28, 2008, although he told other third-party lenders.  #6–14 at p. 14:21–p.56:1.  As his reason for not informing them, he stated that he "did not think that the debt

to Barbara Mora met all events' [*sic*] test required to include
liabilities in financial statements.  Everything had not happened
that is a practical matter, when it was all said and done, no more
than $579,000 would be paid to Barbara Mora so we would not show it
on financial statements." *Id*. at p. 55:16-21.  Abraham, when given
an opportunity later in the trial, explained what an "all events
test" was:

> Before an item is listed in a lot, it is a liability in
> a corporate financial statement, or any other financial
> statement for that matter, and the liability has to pass
> several tests.  One of them is:  This is what is owed
> under the terms of the agreement with the vendor or
> creditor, whoever.  There has to be no likelihood of not
> paying it off.  It has nothing to do with the deal
> between the financial statement entity and the Creditor.

He also stated that he capped the amount owed to the Plaintiffs
because "[I]n my mind, the amount was getting so high and possibly
beyond Heartland being able to repay it short of selling some Sealy
Station land at a substantial profit, that in my opinion, if I
offered the Creditors at that point, $579,000, they would jump on
it." *Id*. at p. 60:19-23.  He did not tell Mora and Neill because
"[i]t has nothing to do with the deal between Heartland and the
Plaintiffs.  It is strictly something on the financial statements
of Heartland Homes" and is a matter of Heartland Homes' personal
accounting.  *Id*. at p. 61:1-5.

     For the same reasons as above, the Abrahams also did not have
a duty to disclose these matters to their lenders.

V.  The Bankruptcy Court did not commit error in stating in the 2008

meetings that Appellants and their corporations had no money and that there was nothing left for Appellants and in failing to disclose cash and equity from recent transactions (a) cash and benefits received from the sale and leaseback of the Business Office to the mother of Candice Abraham; (b) the $200,000+ equity in the contract to sell 96 acres of land; and (c) the $400,000+ equity in the sale/option agreement between Terry Koy, Trustee, and C&J Land & Cattle, Inc.

Joseph Abraham testified that in the second meeting with Mora and Neill on December 28, 2008 he told them that basically he was out of money and that the construction office had been sold by C&J on December 1, 2008 to Candice Abraham's mother, Bonnie Onks, for $130,000.   #6-6 at p. 72:17-73:4; p. 74:18-22; p. 82:1-9.   He explained that he could not pay Mora and Neill because there were no proceeds from the sale of Sealy Station:  although the closing statement showed a little more than $300,000, the cost of putting in a storm sewer, lift station, and easements required under the contract exceeded that amount. #6-12 at p. 42:15-21.  The front 92 acres of Sealy Station were sold by C&J to Terry Koy for $480,000, but Abraham conceded that he did not tell Mora and Neill about that sale.  #6-6 at p. 80:9-11; p. 96:19-24.  He also stated that he could not recall if he told Mora and Neill that there would be possibly $200,000-plus in equity once David Cryon purchased the back 96 acres.  Since the potential sale to Cryon fell through because

-44-

the Abrahams had a better offer from Koy, that money was never realized.  #6-12 at p. 57:8-p. 58:3; #6-6 at p. 96:10-18; p. 97:19-98:7.  The Abrahams' explanation for the sale to Koy was a rational business decision.  At the time the property was about to go into foreclosure, and in selling it to Koy, they avoided foreclosure and obtained an option to repurchase it within four years if they made annual payments.  #6-12 at p. 56:8-21; #6-6 at p. 80:2-16.  As for carving out an area on which the office was constructed and selling it for $130,000 to Bonnie Onks, Abraham's mother-in-law, on December 1, 2008, it, too, was facing imminent foreclosure.  #6-14 at p. 5:10-13; #6-7 at p. 82:1-9.  Joseph Abrahams testified that after the purchase, he was able to continue to use that office up through June 2009.  #6-6 at p. 74:14-p. 76:5.  The Court agrees with Judge Bohm that Appellants fail to show by a preponderance of the evidence that there was any fraud involved.

For these reasons, the Court

ORDERS that Judge Bohm's findings of fact and conclusions of law in Adversary Proceeding No. 10-03227 are AFFIRMED.

**SIGNED** at Houston, Texas, this 7th day of July, 2014.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE